Filed 1/13/22  P. v. Scobee CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>WESLEY HEATON SCOBEE,<br><br>      Defendant and Appellant. | C092306<br><br>(Super. Ct. No. 18FE014720) |

Defendant Wesley Heaton Scobee was charged with the first degree murder of his father.  At trial, defendant testified that his father was an alcoholic who verbally abused him; defendant "snapped" when he learned that his father was having a sexual relationship with defendant's girlfriend and he shot his father in the head.  He was convicted of second degree murder with the use of a firearm.  He now claims that he is entitled to a reduction of his conviction to voluntary manslaughter because the evidence was insufficient to prove the malice required for second degree murder.  We disagree.

1

We have, however, discovered fees that must be vacated in light of recent changes to the law. As modified, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

At the time of the shooting, the Scobee household consisted of defendant, his father Ernie ("Butch"), his disabled dependent adult brother Erin ("Cowboy"), and his girlfriend Lorri Butz. Defendant and Butz lived in the garage. Through a combination of efforts, defendant and Butz cleaned the house, did yard work and laundry, and cooked meals. Defendant cared for Butch, who was 71 years old and a severe alcoholic. Caring for Butch included cleaning his room and, when Butch was heavily intoxicated, picking him up off the floor and cleaning up after he lost control of his bodily functions.

Although Butch mainly passed out on the couch when he was drunk, he occasionally interacted with the household. At times, Butch would have disagreements with defendant, make inappropriate comments of a sexual nature in the presence of defendant and Butz, call defendant a "fucking idiot," and throw beer cans, garbage, and food on the floor in front of Butz and defendant after they had just cleaned. Butch also locked defendant and Cowboy out of the house at times and, at other times, made Cowboy stay in his room. This behavior frustrated defendant, but he never became violent. It hurt defendant to see his father so intoxicated and engaging in such behavior.

Butz lived with the Scobee family for over a year. Although she and defendant were sexual partners and slept in the same bed, they never kissed. Defendant repeatedly reminded her they were not boyfriend and girlfriend; they were roommates. During this time, defendant kicked her out multiple times, threw her property out on the street and pushed her out of the house. During arguments, defendant routinely called Butz a "fucking idiot" because "she's not the brightest person." Butz said defendant was like "Jekyll and Hyde"; something small would spark defendant's ire and he would go "from zero to a hundred."

2

Defendant also told Butz that he thought Butch had slept with defendant's ex-wife and all of his partners at some point in time. Defendant accused her of sleeping with Butch "all the time" and thought she was "doing something with his father while his father would be on the floor or on the couch and had his pants open." Butz did not even look at Butch if she passed him on the couch.

Defendant testified that several days prior to the shooting, he found his dad alone on the couch holding his penis. Defendant said he began to suspect Butch was having an affair with Butz. A couple of days later, defendant found Butz's sex toy in Butch's bed. He posted a note about the discovery on Facebook. Later, Butch told defendant that Butz had to leave. Defendant asked Butch whether he was in a relationship with Butz. Butch was intoxicated and said, "well, yeah, I've been fucking her. We're in a relationship." Defendant responded, "fine."

Defendant said he cried the whole night into the morning because he did not foresee such a direct answer. When Butz heard the accusation, she tried to enlist Butch's help in convincing defendant that they were not having an affair and that defendant was mistaken. Butch was drunk and just stared at Butz. Defendant repeatedly told Butz to move out. At one point, Butch said to defendant, "she doesn't need to leave, you're the problem, you leave." Butz moved out four days prior to the shooting.

Around that same time, defendant told his neighbor, Gerald Reese, that Butch was bullying him and Cowboy. Defendant told Reese that Butch was locking Cowboy out of the house or making him stay in his room.

In the early hours of the morning before the shooting, defendant texted Butz several times. He stated he was depressed and urged her to come back so they could talk. Although defendant still believed she was having a sexual relationship with Butch, he texted, "I'm scared I'm going to hurt myself" and referenced death.

On the morning of the shooting, defendant told Butch he was moving out. Defendant packed up his belongings and loaded them into his car. He hoped to store his

3

belongings at a friend's house and live in his car. None of his friends were home. He returned to the Scobee home about 10 minutes after he left.

Defendant decided to commit suicide. When he parked, he left the car running, connected a hose to his exhaust pipe and led the hose into the garage. As he sat in his room inhaling the exhaust, he heard Butch yelling. He went inside the house to check on Cowboy. When he asked Butch what he was yelling about, Butch just shrugged his shoulders. Defendant then told Butch he could have Butz; he was going to kill himself. Butch said that he "didn't give a fuck" and that he's "fucking [Butz]" and if defendant didn't like it, he can "get the fuck out."

Defendant "snapped." He went to Butch's bedroom and grabbed a loaded gun and an extra bullet from a nearby dresser drawer. He walked up behind Butch, who was lying on the couch, put a pillow over Butch's head and shot him. He reloaded the gun and planned to shoot himself, but changed his mind and shot his father in the head a second time.

Defendant then went to a neighbor's house, admitted he had shot his father, and a different neighbor called the police. Defendant returned home, asked Cowboy to go outside, then "turned on the gas," hoping the house would explode. When police arrived, fumes were prevalent throughout the whole house.

Butch's blood-alcohol level was 0.40 percent. This level was the equivalent of 21.5 to 22 drinks in his system and probably would have killed an average person who drank occasionally. If the person was a heavy drinker, like Butch, the individual would have a higher tolerance, but one could expect delayed or slowed information processing, impaired judgment, and an inability to divide attention.

The prosecution charged defendant with first degree murder (Pen. Code, § 187, subd. (a))[1] and further alleged that defendant personally discharged a firearm, causing Butch's death (§ 12022.53, subds. (b), (c), & (d)). The jury was instructed on first and second degree murder and the effect of provocation on the degree of murder. The jury was also instructed on voluntary manslaughter and the heat of passion. The jury found defendant guilty of second degree murder and found true the firearm allegation under section 12022.53, subdivisions (b), (c), and (d). The trial court sentenced defendant to 15 years to life for second degree murder and imposed a 10-year term for the firearm use. The trial court also imposed a jail booking fee of $453.62 and a jail classification fee of $90.65, pursuant to Government Code former section 29550.2.

DISCUSSION

I

Second Degree Murder Conviction

Defendant argues the verdict of second degree murder cannot be sustained because the prosecution failed to prove beyond a reasonable doubt that he did not kill his father in the heat of passion. He claims that the frustration and stress of caring for Butch, an abusive heavy drinker, and Cowboy, who needed to be monitored and protected, were mounting. When Butch said he was having sex with Butz, he "snapped" and killed his father. He asserts that the most culpable offense of which he can be convicted is manslaughter. We cannot agree with this conclusion.

Homicide is separated into two classes, the greater offense of murder and the lesser included offense of manslaughter. Second degree murder is an unlawful intentional killing with malice but without the premeditation, willfulness, or deliberation that would constitute first degree murder. (*People v. Beltran* (2013) 56 Cal.4th 935,

---

[1] Undesignated statutory references are to the Penal Code.

5

942.)  Voluntary manslaughter is committed when the unlawful intentional killing results from a sudden quarrel or heat of passion induced by adequate provocation such that malice is negated.  (§ 192; *People v. Saille* (1991) 54 Cal.3d 1103, 1114.)

A heat of passion theory of manslaughter has both an objective and a subjective component.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)  To satisfy the objective or " ' "reasonable person" ' " element of this form of voluntary manslaughter, the conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  (*People v. Lee* (1999) 20 Cal.4th 47, 59.)  To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.  (*People v. Wickersham* (1982) 32 Cal.3d 307, 327, disapproved of on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.)  "[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . ."  (*Wickersham*, at p. 327.)

When a factual circumstance negates an element of the crime, as heat of passion negates malice, the prosecution bears the burden of proving the absence of that circumstance beyond a reasonable doubt.  (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704; *People v. Bloyd* (1987) 43 Cal.3d 333, 349.)  In such cases, if the fact finder determines the killing was intentional and unlawful, but is persuaded beyond reasonable doubt that provocation and heat of passion were absent, it should find the defendant guilty of murder.  (See *People v. Dewberry* (1959) 51 Cal.2d 548, 556-557.)

In reviewing a challenge to the sufficiency of the evidence, we presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  We then examine whether the record, in the light most favorable to the judgment, discloses substantial evidence such that a reasonable trier of fact could find the

defendant guilty beyond a reasonable doubt.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

We conclude substantial evidence supports a finding that the prosecution met its burden to prove beyond a reasonable doubt that defendant did not act under the heat of passion.

The jury could have reasonably found that the facts and circumstances would not naturally arouse a passion in the mind of an ordinarily reasonable person such that it would cause him to act rashly or without due deliberation.  Defendant routinely reminded Butz that they were simply roommates; she was not his girlfriend.  The jury could have concluded defendant did not hold Butz in such high regard such that knowledge of the affair would provoke him.  Also, defendant's belief of, and reaction to, Butch's claim that he was having an affair appears irrational in light of the circumstances.  Butch was abusive and frequently drunk to the point of either passing out or falling over, and only confirmed the affair when he was intoxicated.  Butz completely denied the affair.  The evidence shows defendant was predisposed to believe the existence of an affair, as he believed Butch had slept with all his partners and frequently accused Butz of having an affair with Butch.  Thus, regardless of whether the jury believed the existence of the affair, the jury could nonetheless believe that confirmation of the affair was not sufficiently provocative to cause an ordinarily reasonable person to act without deliberation.  (See *People v. Steele* (2002) 27 Cal.4th 1230, 1252.)

Even if the jury believed there was sufficient provocation, the evidence shows defendant did not act while subjectively under the actual influence of a strong passion induced by the provocation.  Defendant claims he "snapped" when Butch told defendant that he was having an affair and that he did not care about defendant's feelings.  Even if this final conversation took place, it merely repeated the purported bombshell dropped at least four days prior to the shooting.  Even if, as defendant argues, the provocation grew over time such that notice of the affair caused him to emotionally unravel, defendant did

7

not act while under the intense emotion of its discovery. There was sufficient time between learning of the affair and the shooting for defendant's passion to subside and reason to return. In fact, during those four days, defendant made decisions regarding the housing situation in an attempt to minimize the pain, which demonstrates he was capable of deliberation during that time.

Defendant relies on *People v. Bridgehouse* (1956) 47 Cal.2d 406 (*Bridgehouse*), abrogated on another point in *People v. Lasko* (2000) 23 Cal.4th 101, 110. (AOB 24-26) This case was decided long before *Jackson v. Virginia* (1979) 443 U.S. 307, the case that announced the modern substantial evidence test. (*Id*. at p. 319) *Bridgehouse* does not help defendant here because the decision in that case preceded the establishment of the now well-settled substantial evidence test by over 20 years. Now, as *Jackson* dictates, we must review the evidence in a light most favorable to the judgment.

Also, this case is factually distinguishable. In *Bridgehouse*, defendant's wife had a long-term affair with the victim, with defendant's knowledge. Defendant made significant efforts to keep his family intact, but the wife refused marriage counseling or to end either the affair or the marriage. At a point where defendant was exhausted, he discovered the victim was living in the home of defendant's mother-in-law, which "was a great shock to the defendant who had not expected to see him there or anywhere else." (*Bridgehouse*, *supra*, 47 Cal.2d 406 at p. 413.) Defendant shot the victim several times, killing him. He was convicted of second degree murder, but the Supreme Court modified the judgment to manslaughter. The Court concluded there was adequate provocation as there was ample, uncontradicted evidence that defendant was a man of excellent character; that he was mentally and emotionally exhausted and was white and shaking when he killed the victim. (*Id*. at p. 414.)

In contrast, defendant suspected an affair between Butz and Butch, repeatedly accused Butz of having such an affair and, upon receiving confirmation of the affair, defendant waited several days before delivering the fatal blow. Although defendant was

8

unhappy with the circumstances and thoughts of self-harm materialized, contrary to defendant's claim, this does not mean the prosecution failed to meet their burden to show that malice was present. For purposes of the heat of passion doctrine, "provocation is sufficient not because it affects the quality of one's thought processes but because it eclipses reflection." (*People v. Beltran, supra*, 56 Cal.4th at p. 950.) Even if defendant were sufficiently provoked, heat of passion does not negate malice when "one is provoked [then] later kills." (*Id.* at p. 951.) Based on the record, we reject defendant's claim of error.

## II

### Jail Booking and Classification Fees

Although not raised by defendant, we note that the jail booking and classification fees imposed by the trial court must now be vacated. Assembly Bill No. 1869 (2019-2020 Reg. Sess.) was signed into law in September 2020 and became operative on July 1, 2021. The bill is intended to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system." (Assem. Bill No. 1869, § 2, eff. Sept. 18, 2020, operative July 1, 2021.) Among other provisions, Assembly Bill No. 1869 added Government Code section 6111, also operative July 1, 2021. (Assem. Bill No. 1869, § 11.) It provides that "the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).)

Pursuant to the plain language of the newly enacted statute, the unpaid balances of the jail booking and classification fees are unenforceable and uncollectible, and the portion of the judgment imposing such fees must be vacated. (Gov. Code, § 6111, subd. (a); see also *People v. Clark* (2021) 67 Cal.App.5th 248, 260.)

9

## DISPOSITION

The judgment is modified to vacate the jail booking and classification fees imposed under Government Code former section 29550.2. The trial court is directed to prepare an amended abstract of judgment and deliver a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.


　　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　　　HOCH, J.



We concur:



　/s/
MAURO, Acting P. J.



　/s/
MURRAY, J.